**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RYAN MCDONALD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:11-CV-768-SPM** |
| | ) | |
| **DAVE WEISSENBORN, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

After his arrest, guilty plea, and incarceration, Plaintiff Ryan McDonald ("Plaintiff"),
who is deaf, brought this action against Defendant City of St. Charles ("Defendant" or the
"City") and several of its police officers under 42 U.S.C. § 1983 and Section 504 of the
Rehabilitation Act, claiming that the defendants violated his rights when they arrested and
interrogated him without a sign language interpreter present. (Doc. 1). The Court previously
dismissed all of Plaintiff's claims other than his Rehabilitation Act claim against the City.
(Docs. 4, 5, 19). The City has moved for summary judgment on Plaintiff's Rehabilitation Act
claim. (Doc. 29). After review, the Court finds that the City has demonstrated that it established
effective communication with Plaintiff that resulted in meaningful access to the City's services
and therefore that it did not violate § 504 of the Rehabilitation Act. In addition, Plaintiff has
failed to introduce any evidence showing that a question of material fact exists with respect to his
claim. Accordingly, the Court will enter judgment in favor of the City.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate
Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 36).

# I.     LEGAL STANDARD

The court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party always bears the initial responsibility of informing the court of the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party discharges this burden, the nonmoving party must set forth affirmative evidence from which a jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party may not rest on the allegations in its pleadings, but must set forth specific facts showing that a genuine issue of material fact exists. *Anderson*, 477 U.S. at 256. A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support that fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). The court "'is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.'" *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007) (quoting *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990)).

In considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmovant's favor. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Summary judgment is not proper if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party. *Id.* at 248. However, "[t]he mere existence of a

scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at

252.

## II.     FACTUAL BACKGROUND

Defendant filed its motion for summary judgment on Plaintiff's Rehabilitation Act claim

on August 31, 2012, along with a Statement of Uncontroverted Material Facts in support of its

motion. (Docs. 29-30). Plaintiff filed a response in opposition to the motion on September 26,

2012. (Doc. 35). In contravention of Local Rule 7-4.01(E), Plaintiff's opposition did not include

a statement of material facts as to which Plaintiff contends a genuine issue exists, and Plaintiff

did not otherwise note which of Defendant's listed facts, if any, were in dispute.[2] Plaintiff did,

however, file an affidavit in opposition to Defendant's motion. (Doc. 35). Even when Plaintiff's

*pro se* pleadings and affidavit are construed broadly, Plaintiff has failed to rebut the assertions in

Defendants' Statement of Uncontroverted Material Facts. Thus, all facts in Defendants'

Statement of Uncontroverted Material Facts are deemed admitted by the Court. Local Rule 7-

4.01(E) ("All matters set forth in the statement of the movant shall be deemed admitted for

purposes of summary judgment unless specifically controverted by the opposing party."); *see*

*also Naugles v. Dollar General, Inc.*, No. 4:08CV01943 ERW, 2010 WL 1254645, at *1 (E.D.

---

[2]Local Rule 7-4.01(E) provides:

> A memorandum in support of a motion for summary judgment shall have attached
> a statement of uncontroverted material facts, set forth in a separately numbered
> paragraph for each fact, indicating whether each fact is established by the record,
> and, if so, the appropriate citations. Every memorandum in opposition shall
> include a statement of material facts as to which the party contends a genuine
> issue exists. Those matters in dispute shall be set forth with specific references to
> portions of the record, where available, upon which the opposing party relies.
> The opposing party also shall note for all disputed facts the paragraph number
> from movant's listing of facts. All matters set forth in the statement of the
> movant shall be deemed admitted for purposes of summary judgment unless
> specifically controverted by the opposing party.

Mo. Mar. 24, 2010) (deeming facts in defendant's statement of material facts admitted where a *pro se* plaintiff failed to file a statement of material facts in accordance with Local Rule 7-4.01(E)). Unless otherwise indicated, the facts below are taken from Defendants' Statement of Uncontroverted Material Facts.

Plaintiff is an individual currently incarcerated at the Northeast Correctional Center in Bowling Green, Missouri. He is hearing impaired and speaks American Sign Language ("ASL"). He graduated from high school and college. Before his arrest, he held the same job with a furniture manufacturer for ten years. He has no learning disabilities unrelated to his hearing impairment. Plaintiff can read and understand written English. He can speak, type, and hand-write English, though he has some limitations with vocabulary, syntax, grammar, and spelling. With individuals who do not speak ASL, the clearest form of communication for Plaintiff is written communication in English.

In 2002, Plaintiff was arrested for driving under the influence (DUI). During that arrest, he communicated with the police through written notes, which he admitted he understood. He was later arrested for another DUI, and again he communicated with the police through written notes. Around the time of the arrest that is the subject of this lawsuit, Plaintiff regularly watched television using closed captioning, read internet articles and sometimes books, and communicated by text messaging and sometimes email. (Doc. 30; Pl's. Dep. at 36-40).[3] Plaintiff communicates with his fellow inmate, Brian Francks, who does not speak ASL and is not hearing impaired, through handwritten notes. Francks assisted in preparing Plaintiff's responses to Defendant's Interrogatories, Requests for Admissions, and Requests for Production.

On May 25, 2008, two City police officers responded to Plaintiff's residence to

---

[3] Excerpts from Plaintiff's July 10, 2012 deposition were filed as an attachment to Defendant's Statement of Uncontroverted Material Facts. (Doc. No. 30, Attachment 1).

investigate a report of domestic violence. When the officers arrived, Plaintiff, his girlfriend, and his girlfriend's five-year-old daughter were standing outside the residence, and the daughter told one of the officers that Plaintiff had had sexual contact with her. At the scene, the officers communicated with Plaintiff verbally and through written notes. At his deposition, Plaintiff stated, "The victim was telling [the police] what was going on. The police asked me did you do it, and I said I did it. Then they arrested me and I was put in the back of the car." Plaintiff knew at the time why he was being arrested. Plaintiff did not request an interpreter before speaking to the police officers, being arrested, or being taken to the police station.

After Plaintiff was arrested, the officers took Plaintiff to the City police station, where Detective Dave Weissenborn met with Plaintiff in an interview room. At the station, Plaintiff told Detective Weissenborn that he needed an interpreter. (Pl's. Aff. ¶ 1). Detective Weissenborn told Plaintiff that there were no interpreters available at that time. (Pl's. Aff. ¶ 2). Detective Weissenborn observed that Plaintiff was hearing impaired but could form words and sentences. Detective Weissenborn asked Plaintiff if he could read and write, and Plaintiff nodded his head up and down and verbally stated yes. Detective Weissenborn persuaded Plaintiff to continue with the interview. (Pl's. Aff. ¶ 3).

Detective Weissenborn gave Plaintiff a form titled, "Your Constitutional Rights" ("Miranda Form 1") and directed him to fill it out. (Pl's. Aff. ¶ 3). Plaintiff read and signed Miranda Form 1. The detective asked Plaintiff if he had any questions, and he did not ask any questions. At Plaintiff's deposition, Plaintiff testified that he did not understand what the statements on the form meant. (Pl's. Dep. at 57).

Detective Weissenborn then gave Plaintiff a form titled, "Rights of a Deaf Person" and helped him fill it out. This form stated:

> As a deaf person, in addition to your constitutional rights, you have the right to the appointment of a qualified and impartial interpreter, at no cost to you, who meets your needs and wishes, prior to any questioning, to assist in the interpretation of questions and answers. If you understand this right please place your initials: _____.

(Doc. 30, Attachment 1, at 108). The completed form contains Plaintiff's initials in the space provided. (*Id.*) The completed form also contains an "X" in the space provided next to the statement, "No, I do not want an interpreter at this time" and nothing in the space provided next to the statement, "Yes, I desire to have an interpreter." (*Id.*) The form also stated:

WAIVER

> I understand that I have the right to an appointed interpreter, at no cost to me and who meets my needs and wishes, to assist in interpreting questions and answers and I wish to waive or give up that right. I have been given a reasonable opportunity to confer privately with a qualified and impartial interpreter and I do not wish to do so at this time. I am able to read and write and I believe I can understand questions and communicate my answers without the assistance of an interpreter. No promises or threats of any kind have been made to coerce me into giving up my rights.

(*Id.*) Plaintiff read and signed the Rights of a Deaf Person form and did not ask any questions about it. Initially, Detective Weissenborn directed Plaintiff to sign on the wrong line; Detective Weissenborn asked Plaintiff to re-sign on the appropriate line, and he did so. (Pl's. Aff. ¶ 4, Weissenborn Aff. ¶ 12[4]). At his deposition, Plaintiff stated that he did not understand everything in the form completely. (Pl's. Dep. at 61).

In the interview room, Detective Weissenborn initially communicated with Plaintiff through gestures, handwritten notes, and verbal communications. Plaintiff later agreed to communicate with Detective Weissenborn using a laptop computer. Detective Weissenborn typed questions onto the laptop while Plaintiff read along, then typed Plaintiff's answers to the

---

[4] Detective Weissenborn's affidavit was filed as an attachment to Defendant's Statement of Uncontroverted Material Facts. (Doc. 30, Attachment 2).

questions and showed Plaintiff what he had typed. Any time Plaintiff did not understand a word, Detective Weissenborn explained it to him. Those communications were recorded in the "Laptop Record." Through the laptop communication, Plaintiff and Detective Weissenborn discussed the facts of Plaintiff's crimes in detail. Detective Weissenborn would type a question and turn the laptop to Plaintiff for him to read it, Plaintiff would answer, Detective Weissenborn would type the answer, and then Detective Weissenborn would show Plaintiff what he wrote for the answer. At his deposition, Plaintiff admitted that everything in the Laptop Record was true and that he would not add anything to it, even with the benefit of hindsight.

After speaking with Detective Weissenborn through the laptop, Plaintiff agreed to write out a statement about what had happened in his own words (the "Written Statement"). Plaintiff understood everything he wrote in the Written Statement. At his deposition, Plaintiff admitted that everything in the Written Statement was true and that he would not add anything to it, even with the benefit of hindsight.

On May 26, 2008, Detective Weissenborn wrote a "Probable Cause Statement" in which he recounted his understanding of what Plaintiff had told him about his crimes. At his deposition, Plaintiff confirmed that everything in the Probable Cause Statement was true.

The police later transferred Plaintiff to the St. Charles County Correctional Facility.[5] On May 28, 2008, Detective Weissenborn met with Plaintiff at the St. Charles County Correctional Facility, where the two were separated by a glass partition. Detective Weissenborn provided Plaintiff with another form titled, "Your Constitutional Rights" ("Miranda Form 2"), which Plaintiff read, initialed, and signed. Plaintiff did not have any questions about the form and did not indicate to Detective Weissenborn that he did not understand the form. During the meeting,

_____

[5] The St. Charles County Correctional facility is not a defendant in this case and is not controlled by the City.

Detective Weissenborn asked Plaintiff questions through written notes. Plaintiff responded to the "yes or no" questions through gestures, and to other questions by speaking verbally. Detective Weissenborn wrote down Plaintiff's answers on the "Written Questions Record" after Plaintiff read each question. Using the Written Questions Record, Plaintiff and Detective Weissenborn further discussed the facts surrounding Plaintiff's crimes. At his deposition, Plaintiff admitted that everything in the Written Questions Record was true, and that he would not add to it or say anything different in it, even with the benefit of hindsight.

On February 11, 2009, Plaintiff pled guilty to two counts of First Degree Statutory Sodomy. Plaintiff admitted at his deposition that, even with an interpreter, he would have told Detective Weissenborn the same information, would have given a written statement, and would have pled guilty to his crimes:

Q. How would things have been different if you had been provided an interpreter?

A. It would be much different.

Q. Describe how it would have been different.

A. It would be a good thing to have the interpreter. The communication would be better. I was – it was my right to have an interpreter. That was my preference.

Q. What would you have said – or what – strike that. What would you have had the interpreter say on your behalf?

A. It would be easier to understand everything, all of the words and what they meant. Just like today. I have an interpreter here.

Q. But you still would have told the detective the same things that you told him by yourself, right?

Mr. McDonald: Yes. [6]

---

[6] Plaintiff apparently stated this answer aloud rather than simply signing it for the interpreter.

A.    Yes.  Yeah, I would admit it.

Q.    And you still would have given a written statement?

A.    Yes.

Q.    And you still would have pled guilty in front of the judge?

A.    Yes.  I was sorry for my crime.  I also told the victim's family I was sorry.
      I said I made a mistake.  My crime was a mistake.

(Pl's. Dep.88-89).

During the interviews, Detective Weissenborn often had to explain words and terms to him because he did not understand them.  (Pl's. Aff. ¶ 6).  For much of the interviews, Plaintiff was simply responding to Detective Weissenborn's prompts and facial expressions, trying to sense his attitude, and trying to please him.  (Pl's. Aff. ¶ 6.)  After he talked to a lawyer, he found out that the police personnel did not have his best interest at heart.  (Pl's. Aff. ¶ 7).  Had he understood that the police were not his friends, he would not have talked to them without a lawyer and an interpreter present to protect himself.  (Pl's. Aff. ¶ 9).  In addition, had an interpreter been present, he might have consented to talk with the police, but had he understood "what was really going on," he does not believe he would have spoken to them without a lawyer, who would likely have advised him to stay silent.  (Pl's. Aff. ¶ 9).

Plaintiff seeks damages for lost wages for the time he has missed work since his arrest and for emotional distress.

## III.    DISCUSSION

Section 504 of the Rehabilitation Act provides, in relevant part, as follows:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  To state a prima facie claim under the Rehabilitation Act, a plaintiff must show that (1) he is a person with a disability as defined by statute; (2) he is otherwise qualified for the benefit in question; (3) he was excluded from the benefit due to discrimination based upon disability; and (4) the program or activity from which he is excluded receives federal financial assistance.  *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).  For purposes of the motion under consideration, the City does not dispute that Plaintiff is a qualified individual with a disability who was otherwise qualified for the benefit in question or that it is a public entity receiving federal funds.  Thus, the question before the Court is whether Plaintiff was excluded from a benefit due to discrimination based upon his disability.

In determining whether hearing impaired individuals have been excluded from a benefit and discriminated against by reason of such disability, the legal standard is whether the individuals "receive[d] effective communication that result[ed] in meaningful access to a public entity's services."  *Bahl v. County of Ramsey*, 695 F.3d 778, 784 (8th Cir. 2012); *see also Loye v. County of Dakota*, 625 F.3d 494, 500 (8th Cir. 2010) ("[T]he legal standard is effective communication that results in meaningful access to government services.").[7]  "Depending on the

_____

[7] As the Eighth Circuit has noted, § 504 of the Rehabilitation Act is "similar in substance" to Title II of the Americans with Disabilities Act, and, with the exception of the Rehabilitation Act's federal funding requirement, "'cases interpreting either are applicable and interchangeable'" for analytical purposes.  *Bahl*, 695 F.3d at 783 (quoting *Randolph v. Rodgers*, 170 F.3d 860, 858 (8th Cir. 1999)).  Thus, in this opinion, the Court will not distinguish between

circumstances, this may require the use of auxiliary aids and services, such as interpreters for the hearing impaired." *Loye*, 625 F.3d at 496-97 (internal quotation marks omitted). "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). In addition, "In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." *Id.* The services provided "are not required to produce the identical result or level of achievement" for disabled and nondisabled persons, but must afford the disabled persons "equal opportunity to . . . gain the same benefit." *Loye*, 625 F.3d at 499 (internal quotation marks omitted).

Reading Plaintiff's *pro se* pleadings broadly, Plaintiff identifies three possible events during which the City denied him effective communication and thus violated the Rehabilitation Act: (1) his arrest on May 25, 2008; (2) his interview with Detective Weissenborn at the police station on May 25, 2008; and (3) his interview with Detective Weissenborn at the St. Charles County Correctional Facility on May 28, 2008. The Court will consider whether, as to each of these events, there is a genuine issue of material fact with regard to whether Plaintiff was provided with effective communication that resulted in meaningful access to the City's services.

### A. ARREST ON MAY 25, 2008

Defendants first argue that the arrest of a suspected criminal is not the type of "program" or "activity" that is contemplated by the Rehabilitation Act. (Doc. 31 at 5 n.4). The Eighth Circuit has not yet addressed this issue. *See Bahl*, 695 F.3d at 784 (declining to decide the

---

cases interpreting Title II of the ADA and those interpreting § 504 of the Rehabilitation Act.

question of whether the ADA applied to an officer's pre-arrest actions during a traffic stop because even if it did apply, no violation had occurred). Here, as in *Bahl*, the Court need not decide whether the act of a law enforcement officer effecting an arrest is an activity covered by § 504 of the Rehabilitation Act, because even if it is, no violation occurred.

The undisputed facts establish that communication with Plaintiff at the time of his arrest was effective. When the officers arrived at Plaintiff's residence to investigate a report of domestic violence, the officers communicated with Plaintiff verbally and through written notes, and Plaintiff did not request an interpreter. At his deposition, Plaintiff described the communications at the time of his arrest as follows: "The victim was telling [the police] what was going on. The police asked me did you do it, and I said I did it. Then they arrested me and I was put in the back of the car." Plaintiff also testified that he knew, at the time, why he was being arrested.

Plaintiff's opposition to Defendants' motion for summary judgment does not discuss his arrest or the events leading up to it. Plaintiff does not offer evidence or argument to suggest that he misunderstood anything that the victim told the police or that the police told him, nor does he suggest that there was any information he would have communicated (or not communicated) to the police officers had an interpreter or other auxiliary aid been provided. Thus, the Court finds that the uncontroverted facts demonstrate that Plaintiff received effective communication during his May 25th arrest and that Plaintiff has failed to set forth specific facts showing a genuine issue for trial. Accordingly, the Court finds that summary judgment is appropriate with respect to this portion of Plaintiff's claim. *See Abbott v. Town of Salem, New Hampshire*, No. 05-cv-127-SM, 2008 WL 163043, at *6 (D.N.H. Jan. 16, 2008) (granting summary judgment to the defendant and holding that police officers were under no obligation to provide additional accommodations

related to an arrestee's hearing impairment during her arrest where the facts showed that the arrestee possessed sufficient information to understand why she was being arrested and the officer "had no reason to think that he was not communicating effectively with her").

### B. CUSTODIAL INTERVIEWS OF PLAINTIFF

Defendant argues that custodial interrogation is not the type of program or activity that is covered by the Rehabilitation Act. (Doc. 31, at 5 n.4). That argument is foreclosed by a recent Eighth Circuit decision holding that a post-arrest interview is service covered by the ADA (and, by extension, the Rehabilitation Act), at least where the police have told arrestee that he will be investigated, have begun the process, and have advised the arrestee of his Miranda rights. *See Bahl,* 695 F.3d at 788.[8] As the Eighth Circuit noted, "a custodial interrogation with an interpreter [affords an arrestee] certain benefits, including the right to ask questions and tell his side of the story, which arguably could . . . affect[] the charging decision." *Id.* Here, after Plaintiff was in custody, the police officers advised him of his Miranda rights and conducted two interrogations. Thus, the Court finds that the Rehabilitation Act does apply to the custodial interrogations at issue in this case and will next consider whether the City established effective communication with Plaintiff that resulted in meaningful access to the benefits of those interrogations.

#### 1. *Interview At The Police Station On May 25, 2008.*

In support of its argument that the City established effective communication with Plaintiff, Defendant points to evidence showing that Plaintiff regularly communicates using written English; that Plaintiff and Detective Weissenborn communicated through speech, printed forms that Plaintiff read and signed, typed notes on a laptop, and handwritten notes; that Plaintiff

---

[8] The Eighth Circuit's decision in *Bahl* was released after Defendant filed its Motion for Summary Judgment.

admitted that the written records of his statements to Detective Weissenborn were accurate and complete; and that Plaintiff admitted that he would have made the same statements to Detective Weissenborn had an interpreter been present.

In opposition to Defendants' motion, Plaintiff first points out that he requested an ASL interpreter and no interpreter was provided. The Court notes that the City's decision to communicate with a deaf individual without an interpreter does not, standing alone, establish a lack of effective communication or a violation of the Rehabilitation Act. *See Bahl*, 695 F.3d at 786-87 (upholding summary judgment in favor of a defendant where the police provided a deaf arrestee with a typewritten statement informing him of the charges against him but did not provide an ASL interpreter); *Loye*, 625 F.3d at 500 (upholding summary judgment in favor of the defendant where a nurse assigned to provide services to deaf individuals communicated via writing and email rather than through an ASL interpreter).

The Court acknowledges that here, in contrast to the relevant situations in *Bahl* and *Loye*, Plaintiff did ask for an interpreter.[9] Nevertheless, the failure to accommodate a request for a particular auxiliary aid is not a per se violation of the ADA or § 504 of the Rehabilitation Act. As the Sixth Circuit has stated:

> [W]hile a public entity should take a disabled person's requests into account when providing alternative communications, it is not required to meet those exact requests. What is required by the ADA—and what the state court provided in this case—is an alternative which allows disabled persons to communicate as effectively as a non-disabled person.

*Tucker v. Tennessee*, 539 F.3d 526, 541 (6th Cir. 2008). The court also noted that to "require the provision of the specific accommodation [mentioned in a regulation] . . . undermines any

---

[9] Although the Plaintiff in *Bahl* made requests for an interpreter later, he had not requested one from the relevant defendant at the time the typewritten statement was provided to him. *Bahl*, 695 F.3d at 786.

consideration of the 'reasonableness' or 'effectiveness' of the actual communication provided in a given circumstance . . . ." *Id.* at 539. *See also Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1088 (11th Cir. 2007) (granting summary judgment in favor of the defendant despite factual issues about whether an arrestee had requested an interpreter at the police station, because the facts showed that the officer established effective communication through writing and thus there was no ADA violation). Thus, the Court considers the circumstances as a whole to determine whether there is a genuine issue of material fact regarding whether communication was effective.

The Court finds that given all of the uncontroverted facts in this case, no reasonable jury could find that Detective Weissenborn failed to establish effective communication with Plaintiff.

First, the evidence demonstrates that Plaintiff can, and has regularly been able to, communicate using written English. Plaintiff does not dispute that he can read and understand written English. He also does not dispute that he can speak, type, and hand-write English, though he has some limitations with vocabulary, syntax, grammar, and spelling. He does not dispute that he regularly watches television using closed captioning, reads internet articles, and communicates by text messaging. He has testified that he communicates through handwritten notes with a fellow inmate who does not know ASL, and that that inmate assisted Plaintiff in preparing his responses to Defendant's discovery requests.

Second, the evidence consistently demonstrates that Detective Weissenborn did establish accurate and complete communication with Plaintiff through a combination of written materials, speech, and gestures, even without an ASL interpreter. Detective Weissenborn questioned Plaintiff about his crimes by questioning him via notes typed on a laptop, and Plaintiff admitted that everything in the Laptop Record was true and that he would not add anything to it even with the benefit of hindsight. Furthermore, Plaintiff handwrote a Written Statement the same day, and

he admitted that everything in that statement was true and that he would not add anything to it, even with the benefit of hindsight.  In addition, Detective Weissenborn wrote a Probable Cause Statement describing his own understanding of what Plaintiff had told him about the crime, including details about Plaintiff's state of mind, and Plaintiff admits that everything in the Probable Cause Statement is true.

Plaintiff does not explain how, if communication between himself and Detective Weissenborn was ineffective, the records of the communication produced an admittedly complete and accurate account of his crimes, including details regarding his state of mind. Given that Plaintiff has nothing to add to or change about the records of his communications with Detective Weissenborn, it is clear that Plaintiff was able to understand Detective Weissenborn's questions and to accurately communicate everything he wished to communicate. He was certainly not denied "the right to ask questions and tell his side of the story." *Bahl,* 695 F.3d at 788.

Plaintiff's vague assertion in his affidavit that "for much of the interviews [he] was simply responding to [Detective Weissenborn's] prompts and facial expressions, trying to sense his attitude and trying to please him" does not create a genuine issue of material fact.  Regardless of whether Plaintiff as "trying to please" Detective Weissenborn during the interview, Plaintiff has admitted that the information he gave Detective Weissenborn was accurate and complete, demonstrating that communication was effective.

Plaintiff's suggestion in his affidavit that he would not have talked to the police without a lawyer had he understood "what was really going on" also fails to create a genuine issue of material fact.  Both in his affidavit and deposition testimony, Plaintiff indicated that, even with an interpreter present, he would have "consented to talk to the police," "still would have given a

written statement," "still would have told the detective the same things that [he] told [the detective] by [him]self," and "still would have pled guilty in front of the judge." (Pl's. Aff. ¶ 9; Dep. 88-89). Plaintiff's seemingly contradictory statements do not create a genuine issue of material fact that precludes summary judgment. *See Connolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.").

Plaintiff also asserts in his affidavit that he did not know that "the Police personnel involved did not have [his] best interest at heart" and that he did not understand that "the Police were not [his] friend." These assertions do not raise a genuine issue of material fact concerning whether Detective Weissenborn's communications with him were effective. Detective Weissenborn informed Plaintiff of his constitutional rights using Miranda Form 1, and Plaintiff read and signed the form.[10] As discussed above, Plaintiff can read and understand written English, regularly uses it in his daily life, and used it during his interviews with Detective Weissenborn to create detailed records of his crimes that he admits are accurate and complete. Although he claims in his complaint that he did not understand the form, he did not ask any questions about it at the time, and there is no evidence suggesting that he indicated to Detective Weissenborn that he did not understand it. Plaintiff offers no reason to suggest that, had an interpreter been present, Detective Weissenborn would have done more to communicate to Plaintiff that he was not Plaintiff's "friend" or did not have Plaintiff's best interests at heart.

Similarly, Plaintiff's after-the-fact statement in his deposition that he did not completely understand the "Rights of a Deaf Person" form waiving his right to an interpreter does not create

---

[10] The Court notes that Plaintiff's claim that his constitutional rights were violated due to the City's handling of his *Miranda* warnings is not currently before the Court; it was dismissed because of Plaintiff's guilty plea. (Doc. No. 4, at 5).

a genuine issue of material fact. The Court first notes that in Plaintiff's opposition to Defendant's motion for summary judgment, Plaintiff does not argue that he did not understand the Rights of a Deaf Person form and does not cite any evidence concerning his alleged misunderstanding of this form. (Doc. 35). Plaintiff admits that he can read English, and the form is short and not complex. Plaintiff read and signed the form without asking any questions about it.

There is no evidence that Plaintiff could not read these forms or that he could not have asked questions about them if he had not understood any of the words in them. To the contrary, the record shows that later in the interview, when Detective Weissenborn typed a word Plaintiff did not understand, Plaintiff let the detective know that he did not understand it, and Detective Weissenborn explained what it meant. (Pl's. Dep. 67). The Court finds no genuine issue of material fact concerning whether the information in the form was effectively communicated. *See Bahl*, 695 F.3d at 786-87 (finding on summary judgment that officers had effectively communicated with a hearing-impaired individual who could read English by providing the individual with a typewritten document covering a topic that was not complex, despite the plaintiff's claimed unfamiliarity with some of the legal terms used in the document); *Bircoll*, 480 F.3d at 1088 ("[The plaintiff] can read English, and [the officer] gave him a copy of the form to read. [The officer] thus accommodated [the plaintiff] by giving him written material.").

Plaintiff also argues that the City violated its own "Communications with Persons with Hearing Impairments Procedure" policy (the "Policy") by not providing an interpreter. Even assuming, *arguendo*, that the City's violation of its own policy could establish a violation of the Rehabilitation Act, the Court finds no violation. The Policy states, "An officer seeking to interrogate an arrestee with a hearing impairment must obtain the services of a qualified

interpreter prior to any interrogation, *whenever an interpreter is needed for effective communication*." (Doc. 35 at 7). As discussed at length above, here, effective communication was established even without an interpreter.

Finally, Plaintiff suggests that the City violated 28 C.F.R. §§ 36.203-204 and 206. The regulations cited implement Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations. *See* 28 C.F.R. § 36.101. These regulations are not applicable to Plaintiff's claim under § 504 of the Rehabilitation Act. Thus, the Court will not consider them.

In sum, Defendant has demonstrated that its communications with Plaintiff during the May 25, 2008 interview were effective, and Plaintiff has failed to point to any evidence from which a reasonable jury could conclude otherwise. The Court notes that it is likely that in many cases, a sign language interpreter will be necessary to establish effective communication with a hearing-impaired arrestee during a custodial interrogation. However, on the specific facts before the Court, where Plaintiff has admitted that the information communicated during the interrogation was accurate and complete and that Plaintiff would have communicated the same information even with an interpreter, and where Plaintiff has failed to point to a single fact in the record showing a lack of effective communication, it is clear that effective communication occurred and that Plaintiff had meaningful access to the benefits of a custodial interrogation. Thus, the Court will grant Defendant's motion for summary judgment as to the May 25, 2008 interview. *See Ryan v. Vermont State Police*, 667 F. Supp. 2d 378, 390 (D. Vt. 2009) (granting summary judgment in favor of the defendant on a deaf arrestee's ADA claim based on communications during his booking process where the plaintiff could read, was observed reading a document advising him of the reasons for his arrest, answered several simple questions orally,

and was given written clarification of a word that he did not understand; noting that there was no evidence that the provision of auxiliary aids would have changed the booking process in any way).

### 2. *Interview At The St. Charles County Correctional Facility On May 28, 2008*

Defendant's and Plaintiff's arguments with respect to the May 28th interview are essentially the same as their arguments with respect to the May 25th interview, except that there is no evidence Plaintiff repeated his request for an interpreter on May 28th. On May 28, 2008, Plaintiff again read, initialed, and signed a form informing him of his Miranda rights, again asking no questions about the form and giving no indication that he did not understand it. In the interview that followed, Detective Weissenborn asked Plaintiff questions through written notes, Plaintiff responded through gestures and speech, and the results were recorded in the Written Questions Record. Plaintiff admitted in his deposition that everything in the Written Questions Record was true and that he would not add to it or say anything different, even with the benefit of hindsight.

For the reasons discussed above with respect to the May 25, 2008, interview, the Court finds that Defendant has demonstrated that its communications with Plaintiff during the May 28th interview were effective and provided him with meaningful access to the benefits of custodial interrogation, and Plaintiff has failed to point to any evidence from which a reasonable jury could conclude otherwise. Thus, the Court will grant Defendant's motion for summary judgment as to Plaintiff's claim with respect to the May 28, 2008 interview.

## IV.    CONCLUSION

Based on the foregoing, the Court finds that Plaintiff has not demonstrated a genuine issue of material fact as to his claims against Defendant and that Defendant is entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED THAT** Defendant City of St. Charles's motion for summary judgment (Doc. 29) **is GRANTED.**

An appropriate Judgment will accompany this Memorandum and Order.


/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of January, 2013.